**UNITED STATES of America**

v.

**Carmen FENECH.**

**Criminal Action No. 95–234–01.**

United States District Court, E.D. Pennsylvania.

April 9, 1996.

Dennis J. Cogan, Dennis J. Cogan & Associates, Jose Ongay, Philadelphia, PA, L. Felipe Restrepo, Krasner & Restrepo, Philadelphia, PA, Guillermo L. Bosch, Collegeville, PA, for Carmen Fenech.

David L. Hall, Bernadette A. Mc Keon, U.S. Attorney's Office, Philadelphia, PA, for U.S.

## *MEMORANDUM*

PADOVA, District Judge.

## I. BACKGROUND

On September 1, 1995, Defendant Carmen Fenech was convicted by a jury of the following offenses: (1) conspiracy to import cocaine in violation of 21 U.S.C.A. § 963 (West Supp.

1995) (Count I); (2) conspiracy to commit money laundering offenses in violation of 18 U.S.C.A. § 1956(h) (West Supp.1995) (Count II); (3) money laundering in violation of 18 U.S.C.A. § 1956(a)(3) (West Supp.1995) (Count III); and (4) money laundering in violation of 18 U.S.C.A. § 1956(a)(2) (West Supp.1995) (Count IV).

At trial, the Government sought to prove that Defendant was the ringleader of a conspiracy to launder $5,000,000 and transport 400 to 500 kilograms (roughly half a ton) of cocaine from Venezuela to the United States. Currently before the court is Defendant's post trial motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29 or, in the alternative, for a new trial pursuant to Fed. R.Crim.P. 33. For the reasons that follow, Defendant's Motion for a judgment of acquittal will be denied. Defendant's Motion for a new trial will be granted.

## II. MOTION FOR JUDGMENT OF ACQUITTAL

### A. Standard of Review

In deciding a motion for a judgment of acquittal under Fed.R.Crim.P. 29, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974) (citation and internal quotation omitted). The court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Coleman,* 862 F.2d 455, 460–61 (3d Cir.1988) (internal quotation omitted), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2074, 104 L.Ed.2d 638 (1989) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

■ For a judgment of acquittal to be granted, the court must decide, as a matter of law, that the evidence presented at trial was insufficient to support the conviction. *United States v. Cohen,* 455 F.Supp. 843, 852 & n. 7 (E.D.Pa.1978), *aff'd,* 594 F.2d 855 (3d. Cir.), *cert. denied,* 441 U.S. 947, 99 S.Ct.

2169, 60 L.Ed.2d 1050 (1979). Evidence which is sufficient to support a conviction need not be direct evidence, and the conviction will stand if supported by circumstantial evidence. *Id.* at 851. "In reviewing the testimony for determining a Rule 29 motion, questions of the weight of the evidence or of the credibility of the witnesses are foreclosed by the jury's verdict." *Id.* at 852 (citation omitted). All reasonable inferences to be drawn from the evidence must be examined in the light most favorable to the Government as the non-moving party. *United States v. Sturm,* 671 F.2d 749, 751 (3d Cir.), *cert. denied,* 459 U.S. 842, 103 S.Ct. 95, 74 L.Ed.2d 86 (1982).

### B. Discussion

■ As a preliminary matter, Defendant suggests that the conspiracy convictions must be reversed because the Government's case-in-chief departed from the charges embodied in the indictment. Specifically, Defendant contends that the indictment charged her with conspiring with her co-Defendant Julio Tommasino. Because the Government voluntarily dismissed the charges against Tommasino prior to trial, Defendant argues that the Government's case represents a "fatal variance" from the charges contained in the indictment. Def's Mem. at 10.

■ Defendant's characterization of the indictment is simply incorrect. The indictment charges Defendant with conspiring with Tommasino "and others, the identities of whom are known and unknown." Indictment Counts I & II. Where an indictment alleges a conspiracy between the defendant and both named and unnamed persons, proof of the conspiracy between the defendant and the unnamed persons alone is sufficient to support the conviction. *See United States v. Obialo,* 23 F.3d 69, 72 (3d Cir.1994) (discussing *Gov't of Virgin Islands v. Hoheb,* 777 F.2d 138 (3d Cir.1985), for proposition cited). Defendant's argument on this ground fails.

Defendant also challenges the sufficiency of the evidence supporting her convictions for conspiracy on counts one and two of the indictment. Defendant's conviction for conspiracy to import cocaine (Count I) required the Government to prove beyond a reason-

able doubt that an agreement to import cocaine existed and that Defendant knew of the agreement and voluntarily participated in it. *United States v. Ojebode,* 957 F.2d 1218, 1223 (5th Cir.1992), *cert. denied,* 507 U.S. 923, 113 S.Ct. 1291, 122 L.Ed.2d 683 (1993); *United States v. Obregon,* 893 F.2d 1307, 1311 (11th Cir.), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990); *United States v. Ford,* Crim. A. No. 92–161, 1992 WL 368372, at *2 (E.D.Pa. Dec. 4, 1992). No overt act is required under § 963. *United States v. Nolan,* 718 F.2d 589, 595 (3d Cir. 1983). *Accord, United States v. Elledge,* 723 F.2d 864, 866 (11th Cir.1984); *United States v. Grammatikos,* 633 F.2d 1013, 1023 (2d Cir.1980).

Defendant's conviction for conspiracy to commit money laundering (Count II), required the Government to prove beyond a reasonable doubt that: (1) the conspiracy, agreement, or understanding to commit money laundering[1] was formed, reached, or entered into by two or more persons; (2) at some time during the existence or life of the conspiracy, one of its alleged members knowingly performed one of the overt acts charged in the indictment in order to further or advance the purpose of the agreement; and (3) at some time during the existence or life of the conspiracy, the defendant knew the purpose of the agreement, and then deliberately joined the conspiracy. *United States v. Conley,* 37 F.3d 970, 976 (3d Cir.1994). *See*

*also United States v. Rankin,* 870 F.2d 109, 113 (3d Cir.1989).

■ Defendant argues that the evidence presented at trial is insufficient to prove that a conspiratorial agreement existed between Defendant and any co-conspirator. Defendant grounds her argument on *United States v. Wexler* and its progeny. 838 F.2d 88 (3d Cir.1988). *Wexler* stands for the proposition that in order for there to be a conspiratorial agreement, the Government must prove that the conspirators "shared a unity of purpose, the intent to achieve a common goal, and an agreement to work together toward that goal." *Id.* at 90–91 (internal quotations omitted). The conspirators must necessarily possess specific knowledge of the illegal objective contemplated by the conspiracy. Merely "keeping bad company" is not enough. *Id.* at 91.

In *Wexler,* the prosecution presented evidence that the defendant engaged in suspicious conduct that suggested his participation in a conspiracy to possess illegal drugs. This conduct included conversing with his co-conspirators, acting as a lookout for the operation, signaling the arrival of a co-conspirator at a rendezvous point, driving the truck containing the drugs, and possessing a fictitiously obtained CB radio at the time of his arrest. *Wexler,* 838 F.2d at 91. The court found the evidence insufficient to support the conviction because the case lacked any evi-

---

1. Defendant was charged under two of the money laundering provisions of 18 U.S.C.A. § 1956. Section 1956(a)(2) reads in pertinent part as follows:

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or a place in the United States from or through a place outside the United States—
(A) with the intent to promote the carrying on of a specified unlawful activity; or
(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law.
[shall be fined and imprisoned as set forth herein].
18 U.S.C.A. § 1956(a)(2) (West Supp.1995). Section 1956(a)(3) reads in pertinent part as follows:
(3) Whoever, with the intent—
(A) to promote the carrying on of specified unlawful activity;
(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
(C) to avoid a transaction reporting requirement under State or Federal law,
conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, [shall be fined and imprisoned as set forth herein].
18 U.S.C.A. § 1956(a)(3) (West Supp.1995).

dence that the defendant knew that a controlled substance, as opposed to some other contraband, was the object of the conspiracy *Id.* at 91. "[T]he evidence was just as consistent," the court held, "with a conspiracy to transport stolen goods, an entirely different crime." *Id.* at 92.

Unlike *Wexler*, the Government's evidence in the instant case supports each element of Defendant's conspiracy convictions on both the drug and money laundering charges. In its case-in-chief, the Government presented the testimony of its informant witness, who testified under the alias Jerry Diez, to support the conspiracy charges. Diez testified that he was first contacted by Defendant in October 1994, when she inquired about the purchase of an airplane. Tr. 2 at 14, 15. Diez testified that he was suspicious about the inquiry because Defendant was not the representative of any company, the transaction was to be in cash, and Defendant wanted Diez to fly the aircraft to Venezuela or Columbia. Tr. 2 at 17.

After contacting authorities to report his suspicions, Diez flew at Defendant's expense to Venezuela to meet with her. Tr. 2 at 18. Diez testified that while in Venezuela, Defendant told him that she wanted to arrange a meeting between Diez and Defendant's "business associates" who were looking to transport approximately three hundred kilos of cocaine to the United States. Tr. 2 at 19. Diez testified that he did in fact attend meetings with Defendant and her business associates, and that at those meetings they discussed plans for transporting cocaine to the United States and United States Currency to South America. Tr. 2 at 19–24. One of the associates who attended these meetings was an individual named "Freddie" whom Defendant introduced as her "partner." Gov's Ex. 22 at 21; Tr. 2 at 29. *See United States v. Allen*, 613 F.2d 1248 (3d Cir.1980) (finding evidence of conspiracy with person named "Stewart" sufficient despite unknown identity of "Stewart"). Diez also testified that at the conclusion of those meetings, a deal had been struck with Defendant to import cocaine to the United States and to export United States currency out of the country. Tr. 2 at 24.

■ This testimony is clearly sufficient to allow a reasonable juror to conclude that Defendant and her "associates" were engaged in a conspiracy to import drugs to the United States and to export currency. Defendant argues that the only agreement that the evidence supports is the one between Defendant and Diez. I disagree. Defendant brought Diez to her location and arranged for him to meet with her associates. Diez, Defendant, and the associates did in fact meet, and discussed the terms of the conspiracy amongst themselves. Unlike the evidence in *Wexler*, the evidence in the instant case leads to the reasonable conclusion that the associates, including Freddie, were full partners in the conspiracy and were well aware of its terms and objectives. The inability of the Government to name and personally identify the other conspirators is not fatal to the conspiracy convictions. *Obialo*, 23 F.3d at 72. "[T]he identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown." *Rogers v. United States*, 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951).

■ Other evidence also supports the conviction for conspiracy to launder money. United States Customs Agent Markovchick, acting under-cover as "Don Marco," portrayed himself to Defendant as the representative of an organized crime group in possession of proceeds from illegal activities that the group wanted taken out of the country in order to evade taxes. Tr. 3 at 119. Agent Markovchick testified that he had two meetings with Defendant and her flight crew to discuss the exportation by airplane of large sums of money. These meetings were secretly recorded on audio tape. At one point, agent Markovchick expressly asked Defendant if everybody in her party "knows what's going on here." Gov't Ex. 21 at 9–10. Defendant replied "we all know ... what's going on, of course.... The transfer of money. All of us." Gov't Ex. 21 at 10. Other clandestinely taped conversations indicate that Defendant was aware that she was transporting large amounts of cash out of the country and that the money was the proceeds

of drug transactions. *Id.;* Gov't Ex. 22 at 19, 28. Prior to departing the country, Defendant accepted a briefcase filled with $250,000 in cash that was represented to be payment for her money laundering services. Tr. 3 at 144–45. Her crew also took possession of a number of suitcases that were represented to contain $5,000,000 in illegal proceeds. Tr. 3 at 146.

The participation of the flight crew in meetings to discuss the exportation of illegal money, and Defendant's statement that everyone knew what was going on, supports the conclusion that Defendant and her flight crew were members of the conspiracy and understood the purpose of the agreement— to transport funds out of the United States in order to avoid taxes and promote drug trafficking. Defendant engaged in numerous overt acts in furtherance of the conspiracy, not the least of which was accepting payment for her services. The evidence suffices to establish the elements of a conspiracy to commit money laundering in violation of 18 U.S.C.A. § 1956(a)(2)(A) and (h).

I conclude that the evidence presented at trial is sufficient to support Defendant's convictions on Counts I and II of the indictment.[2] Accordingly, Defendant's Motion for a judgment of acquittal will be denied.

## III. MOTION FOR A NEW TRIAL

### A. Standard of Review

 A motion for a new trial may be granted if required in the interest of justice. Fed.R.Crim.P. 33. *See also United States v. Phifer,* 400 F.Supp. 719, 722 (E.D.Pa.1975), *aff'd,* 532 F.2d 748 (3d Cir.1976). It is a remedy to be used sparingly, reserved for exceptional circumstances, where the evidence preponderates heavily against the verdict or where failure to grant a new trial would result in a miscarriage of justice. *See Phifer,* 400 F.Supp. at 722 (citing *United States v. Leach,* 427 F.2d 1107, 1111 (1st

Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 95, 27 L.Ed.2d 59 (1970)). The decision to grant a new trial is within the sound discretion of the trial judge, although a new trial must be granted if there is a reasonable probability that error in the proceedings had a substantial influence on the jury's decision. *See Gov't of the Virgin Islands v. Bedford,* 671 F.2d 758, 762 (3d Cir.1982).

### B. Discussion

#### 1. Brady Violation

Following trial, Defendant filed a motion for *in camera* review of certain Government files to determine whether the Government failed to turn over impeachment evidence as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). That motion was granted. My review of the materials turned over by the Government compels the conclusion that a *Brady* violation occurred, mandating a new trial.

 A *Brady* violation occurs when: (1) the prosecution suppresses or withholds evidence; (2) which is favorable; and (3) material to the defense. *United States v. Perdomo,* 929 F.2d 967, 970 (3d Cir.1991). Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule. *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766; *Perdomo,* 929 F.2d at 972. Evidence covered by the *Brady* rule is "evidence favorable [and material] to the accused so that, if *disclosed and used effectively,* it may make the difference between conviction and acquittal." *Perdomo,* 929 F.2d at 972 (quoting *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985)) (internal quotations omitted) (emphasis original). A defendant is entitled to a new trial where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probabili-

---

**2.** Following the close of evidence, I instructed the jury, under *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), that were it to convict Defendant of the conspiracy charges, and provided the other requirements of *Pinkerton* were met, it could convict Defendant of the substantive charges based on her partic-

ipation in the conspiracy. Tr. 5 at 89–90. Defendant argues that, having instructed the jury under *Pinkerton,* reversal of the conspiracy convictions would require reversal of the substantive convictions as well. Because I find the evidence sufficient to support the conspiracy convictions, I need not reach this issue.

ty is a probability sufficient to undermine confidence in the outcome. *Perdomo,* 929 F.2d at 971 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383). The good faith or bad faith of the Government is irrelevant to the analysis. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197.

■ In the instant case, the Government's case rested to a large degree on the testimony of its informant witness Jerry Diez. The credibility of this key witness was crucial to the prosecution. At trial, Diez testified that he had assisted the Government in a number of previous cases. He indicated that the only financial compensation that he received from the Government was reimbursement for out-of-pocket expenses. Tr. 3 at 94–96. On redirect examination, the following exchange occurred.

Q. Just one more question, Mr. Diez. You were asked about your—the work that you have performed for law enforcement over the years. Why do you do it?

A. Why do I do it?

Q. Yes.

. . . .

A. It's—It's a very profound question. Let me answer the best way possible. I like the work. I feel that I'm doing something real good for the world.

Q. Do you do it for the money?

A. No.

Tr. 3 at 106.

My *in camera* review of the Government's files included examination of the Government's case file relating to Diez. My inspection revealed an information card prepared by the case agent based on information provided by Diez. That card expressly indicated that Diez's motivation for cooperating with the Government was monetary. This information was not provided to the defense prior to trial. Had the defense been made aware of this information, it would have been in a much stronger position to impeach the credibility of the Government's key witness. The failure to disclose this valuable impeachment evidence places the jury's verdict in doubt and undermines confidence in the outcome of the trial.

I conclude that the Government withheld evidence favorable and material to the defense in violation of the rule established in *Brady* and expanded in *Giglio.* I will therefore grant Defendant's motion for a new trial.

### 2. Witness' Use of a Pseudonym

■ At trial, the Government's key informant witness did not testify under his real name. Rather, he used the pseudonym "Jerry Diez." During cross-examination, defense counsel asked the witness his real name. The Government objected to the question and the Court sustained the objection. Defendant now contends that allowing the witness to testify under a pseudonym and preventing the disclosure of the witness' real name on cross-examination constituted an improper restriction on Defendant's Sixth Amendment right to cross-examination.

■ The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI. The essential purpose of confrontation is to provide the defendant with the opportunity to cross-examine. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). While a defendant is entitled to an opportunity to cross-examine and impeach the testimony of a witness, the Confrontation Clause does not guarantee "cross examination that is effective in whatever way and to whatever extent, the defense might wish." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *United States v. McGlory,* 968 F.2d 309, 343 (3d Cir.), *cert. denied,* 506 U.S. 956, 113 S.Ct. 415, 121 L.Ed.2d 339 (1992). The trial court may limit defense counsel's cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive, or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435. The scope and extent of cross-examination is within the sound discretion of the trial judge. *United States v. Rockwell,* 781 F.2d 985, 988 (3d Cir.1986).

In *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), the Supreme Court addressed a case in which the principal witness for the prosecution testified under a false name and did not provide an address or other indication of his residence. The case involved a drug deal in which only the defendant and the anonymous witness had first hand knowledge of the transaction. Thus, "the only real question at trial ... was the relative credibility of the [defendant] and the prosecution witness." *Id.* at 130, 88 S.Ct. at 749. When defense counsel sought to elicit the witness' name and address on cross-examination, the court sustained the prosecution's objections to the questions. The Supreme Court stated that:

> [W]hen the credibility of a witness is at issue, the very starting point in exposing falsehood and bringing out the truth through cross examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.

*Id.* at 131, 88 S.Ct. at 750 (internal quotations omitted). The Court went on to quote *Alford v. United States*, with approval.

> It is the essence of a fair trial that a reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them.

*Id.* at 132, 88 S.Ct. at 750 (quoting *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931)). The Court went on to conclude that preventing the defendant from cross-examining the witness as to his proper name and address violated the defendant's Sixth Amendment right to confront the witnesses against him. *Id.* at 133, 88 S.Ct. at 751.

A well recognized exception to the rule laid down in *Smith* exists. Courts have consistently allowed witnesses to withhold their name, address, or place of employment where revealing that information would place the witness in danger. *See e.g., Smith*, 390 U.S. at 134–35, 88 S.Ct. at 751 (White, J. and Marshal, J. concurring) (recognizing safety of witness as proper ground for limiting cross-examination). *Accord, Caldwell v. Minnesota*, 536 F.2d 272, 273–74 (8th Cir.1976); *McGrath v. Vinzant*, 528 F.2d 681, 683–84 (1st Cir.), *cert. denied*, 426 U.S. 902, 96 S.Ct. 2221, 48 L.Ed.2d 827 (1976); *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir.1974); *United States v. Ellis*, 468 F.2d 638, 639 (9th Cir.1972); *United States v. Alston*, 460 F.2d 48, 51–52 (5th Cir.), *cert. denied*, 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972); *United States v. Persico*, 425 F.2d 1375, 1384 (2d Cir.), *cert. denied*, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970); *United States v. Baker*, 419 F.2d 83, 87 (2d Cir.1969), *cert. denied*, 397 U.S. 971, 90 S.Ct. 1086, 25 L.Ed.2d 265 (1970); *United States v. Palermo*, 410 F.2d 468, 472–73 (7th Cir.1969).

In the instant case, the Government's informant witness testified under a false name allegedly to ensure his safety. However, the record contains nothing to suggest that the witness had been threatened and is void of any indication that the witness was in danger. Withholding the witness' true name may be appropriate in some cases, but should be justified on the record. *See e.g., Smith*, 390 U.S. at 134–35, 88 S.Ct. at 751 (White, J. and Marshal, J. concurring) (suggesting that Government or witness should come forward with some showing justifying need to withhold information); *Palermo*, 410 F.2d at 472 (finding that Government bears the burden of proving the existence of a threat to the witness); *Ellis*, 468 F.2d at 639 (adopting procedure articulated in *Palermo* whereby Government must articulate substantial reasons to withhold information to protect witness' safety); *Caldwell*, 536 F.2d at 273–74 (recognizing exception to *Smith* where threat to safety of witness supported by the record).

At a hearing on Defendant's post-trial motions, the Government conceded that its failure to establish a record supporting the need to protect the witness' identify constitutes prejudicial error. The Government has

therefore withdrawn its opposition to Defendant's motion for a new trial. I agree that in the absence of any justification, withholding the witness' true identity and preventing cross-examination as to his real name unnecessarily prevented the defense from exploring "avenues of in-court examination and out-of-court investigation." *Smith*, 390 U.S. at 131, 88 S.Ct. at 750. Accordingly, a new trial is mandated on this basis as well.

An appropriate Order follows.

## ORDER

AND NOW, this 3rd day of April, 1996, upon consideration of Defendant's Post Trial Motions for a judgment of acquittal or for a new trial and the submissions in support thereof (Doc. No. 144), and the Government's Response thereto (Doc. No. 147), IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for a judgment of acquittal is DENIED;

2. Defendant's Motion for a new trial is GRANTED;

3. The jury's verdict is VACATED and a new trial ordered in accordance with the accompanying memorandum.